IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs July 19, 2022

## STATE OF TENNESSEE v. PRISCILLA ANN BARNETT

**Appeal from the Circuit Court for Madison County**
**No. 19-474    Donald H. Allen, Judge**

_____

### No. W2021-00951-CCA-R3-CD

_____

A Madison County jury convicted the Defendant, Priscilla Ann Barnett, of one count of first degree premediated murder, one count of felony murder during the perpetration of aggravated child abuse, and two counts of aggravated child abuse.  The trial court merged the murder convictions and imposed an effective sentence of life imprisonment.  On appeal, the Defendant contends that (1) the evidence is insufficient to support her convictions; (2) the trial court erred in denying her request for funds to retain a mental health expert; and (3) the trial court erroneously imposed consecutive sentences.  After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, J., joined.  JOHN EVERETT WILLIAMS, J., not participating.[1]

A. Russell Larson, Jackson, Tennessee, for the appellant, Priscilla Ann Barnett.

Herbert H. Slatery III, Attorney General and Reporter; Hannah-Catherine Lackey, Assistant Attorney General; Jody S. Pickens, District Attorney General; and Shaun A. Brown and Alfred L. Earls, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

_____

[1] The Honorable John Everett Williams died on September 2, 2022 and did not participate in this opinion.  We acknowledge his faithful service to this Court.

This case arises from an extreme case of child abuse, the result of which lead to the death of three-year-old S.Y. [2] Her sister, four-year-old A.Y., was found by authorities to be near death due to forced starvation. Both victims were the Defendant's granddaughters and in the Defendant's care in her home at the time they were found. For these offenses, a Madison County Grand Jury indicted the Defendant for one count of first degree premediated murder, one count of felony murder during the perpetration of aggravated child abuse, and two counts of aggravated child abuse.

## I. Facts

The following evidence was presented at the Defendant's trial: On October 30, 2018, police officers and emergency personnel responded to a call to the home where the Defendant lived with her adult daughter and her four grandchildren, including S.Y., A.Y., a seven-year-old girl, and a two-year-old boy. When the officers and emergency personnel arrived, they found S.Y.'s decomposing and extremely malnourished body inside one of the bedrooms. They also found A.Y., who was alive but extremely malnourished, and they transported her to a hospital. The Defendant and her daughter subsequently were charged with first degree premeditated murder of S.Y., felony murder of S.Y. during the perpetration of aggravated child abuse, aggravated child abuse of S.Y., and aggravated child abuse of A.Y. The Defendant was tried separately from her daughter.

M.S. testified that she was the paternal grandmother of the victims and the victims' two-year-old brother. M.S. stated that her son, the father of the children, died in an automobile accident in 2016. Prior to October 2018, M.S. had not seen the children in one and one-half to two years. She explained that the Defendant and her daughter would not allow M.S. to see the children. Whenever M.S. learned of their location, they would move and would change telephone numbers. M.S. recalled a few times when she was able to reach them via telephone, the Defendant told M.S. that she was no longer in their lives and that she needed to leave them alone.

In October 2018, M.S.'s daughter called her at work and informed her that S.Y. had passed away and that A.Y. was at the Jackson-Madison County General Hospital ("JMCGH") and was being transferred to LeBonheur Children's Hospital ("LeBonheur"). At that time, M.S. did not know where the Defendant, the Defendant's daughter, and the four children were living. M.S. went to LeBonheur to see A.Y. and testified that she was unaware of A.Y.'s condition prior to that day and that she would have taken some action had she been made aware of A.Y.'s condition sooner. M.S. stated that A.Y. remained hospitalized for approximately one month, and M.S. and her husband obtained custody of

---

[2] This court's policy is to protect the identity of minor victims. Thus, we refer to the victims, as well as some witnesses, by their initials.

A.Y. and her brother, who did not require any medical care. M.S. testified that medical personnel advised her against allowing A.Y. to overeat and explained that doing so could be dangerous to A.Y.'s health. M.S. said that A.Y. had angry outbursts and that they had to reassure her that food was in their home. By the time of the trial, A.Y. was able to eat regularly and was able to go to school, even though she had to repeat kindergarten.

On cross-examination, M.S. testified that the Defendant's daughter allowed her to have visitation with the children before the Defendant's daughter and the children began living with the Defendant. The Defendant refused to allow M.S. to see the children once they began living with her. M.S. stated that the Defendant, as the grandmother, was "controlling." The Defendant sent M.S. text messages telling M.S. to "stay away" and threatening to call the police. M.S. testified, "That was coming from [the Defendant], not from the mother."

Antonio Terry, the manager at Rent-A-Center in Jackson, testified that the Defendant was a customer in 2017 and 2018 and purchased a number of items over the course of that time period. Mr. Terry recalled occasions during which the Defendant and her daughter came into the store while leaving the children alone in their vehicle that was parked in a fire zone. Mr. Terry instructed the Defendant and her daughter to move their vehicle and bring the children inside the store, and they complied. At some point, the Defendant stopped bringing the children to the store, and when Mr. Terry asked about them, she would respond that the children were at home or at school.

Mr. Terry visited the Defendant's residence on multiple occasions to deliver items and to meet with the Defendant after she failed to make her monthly payments. He described the condition of the house as "terrible," stating that trash, clothes, dirty diapers, and moth balls were in the front yard and on the front porch. He stated that while delivering items inside the home, he had to step over clothes, bags of trash, moth balls, and dirty dishes. He observed chains around the refrigerator and the cabinets, and when he asked about the chains, he was told that they were "for protection." As a result, he looked around for an animal in the house but did not see any animals. Mr. Terry stated that the children were at the home during some of the occasions when he was delivering items, and he described the children's condition as "[n]ot well at all," explaining that they were "walking around, clothes not clean, some not with clothes on at all, diapers sagging." Mr. Terry testified that in October 2018, the Defendant reached an agreement with the store to repossess some of the items on which she was unable to continue to make payments. Mr. Terry went to the Defendant's home on numerous occasions in an effort to retrieve the items. While he was knocking on the front door, he could see the Defendant watching television and ignoring him while the children were running around the house.

On October 29, 2018, Mr. Terry and his supervisor went to the Defendant's home in an effort to repossess the items. Mr. Terry noticed that more trash seemed to have accumulated on the front porch. When he knocked on the front door, he heard a baby crying. He continued hearing the baby cry for approximately thirty minutes as he knocked on the door, but no one came to the door. During that time period, he saw one of the children look out of a nearby window. Although Mr. Terry's supervisor did not want to be involved, Mr. Terry was worried about the baby and called the police.

Mr. Terry testified that when the officers arrived, they knocked on the door, but no one came to the door. The officers instructed Mr. Terry and his supervisor to leave the property, and they complied, driving to a nearby parking lot. The officer later came to the parking lot and informed Mr. Terry that the Defendant reported that the child was crying because she was sick. Mr. Terry asked the officer whether he had entered the home and spoken to the children, and the officer stated that the Defendant would only speak to him through an open window. The officer instructed Mr. Terry and his supervisor to not return to the Defendant's home because the situation was "a legal matter."

On cross-examination, Mr. Terry testified that he never called the Tennessee Department of Children's Services about the child because company policy did not allow him to become involved in personal matters and he, therefore, would have been subject to disciplinary action.

Deputy Adam Brown, who was working for the Madison County Sheriff's Department ("MCSD") in 2018, testified that on October 29th at around 4:00 or 5:00 p.m., he received a call about an employee with Rent-A-Center who requested a welfare check at the Defendant's home. Deputy Brown stated that according to the call, the employee was trying to contact someone inside the residence and could hear a child crying. When Deputy Brown arrived at the home, he met Mr. Terry, who reported that he was at the home in order to repossess furniture. Deputy Brown asked Mr. Terry to leave the property while the deputy tried to contact someone inside the house.

Deputy Brown walked around the house several times while knocking on doors and windows. Although he could hear a child inside the house, he was unable to make contact with any of the residents. After he lifted a window at the front of the house and yelled, the Defendant came to the window and stated that she was unable to hear him because she had been sleeping. Deputy Brown instructed the Defendant to open the front door, and she complied. He observed "an excessive amount" of moth balls at the front door and stated that the smell was overpowering. A younger woman who was around twenty to twenty-five years old, a young boy, and a young girl who appeared to be seven or eight years old met Deputy Brown at the front door. Deputy Brown did not hear anyone crying once the two children came to the door, and he did not see any other children in the home. He stated

that he assumed that one of the two children who were standing at the front door had been the child who was crying, and he said the two children seemed "fine." The Defendant never indicated that other children were in the home. Deputy Brown testified that he observed no indication of anything wrong at the residence and that he had no reason to enter the home. He stated that after he left the home, he may have told the employee from Rent-A-Center that the attempted repossession involved a civil matter and that he could not be involved.

Deputy Brown testified that on the following day, he became aware of an incident that occurred at the home. He was directed to the hospital to take photographs of S.Y., who was deceased. Deputy Brown stated that S.Y. was "very malnourished," had a "small gash" on her head, and "probably didn't weigh nothing." He also took photographs of A.Y., who he stated was "very malnourished" and asked him for food. One of the nurses gave him a package of crackers, and he gave A.Y. juice and crackers. Deputy Brown did not see the two victims at the home on the prior day, and the Defendant never provided him with any information on the two victims. He assumed that the two older children at the door were the only two children in the home.

Mike Duck, a critical care paramedic, testified that on October 30, 2018, he was dispatched to the home based on a call of pediatric respiratory distress that was subsequently revised to cardiac arrest. He stated that, generally, when he responded to a call of cardiac arrest, the family members are present and are anxious for him to get to the patient. However, when he arrived at the home, no one was there to meet him. He had to knock on the door and wait for someone to open the door. He stated that while waiting, he began to question whether he was at the correct house. Mr. Duck testified that a small boy and his grandmother came to the door. When Mr. Duck asked whether they called about a cardiac arrest, the boy grabbed Mr. Duck's hand and ran down a hall to a bedroom where a small child was lying on the floor and underneath a blanket. Mr. Duck noted an odor in the house, which he described as an "odor of death," which occurs when someone has been dead for a period of time and is decomposing. He stated that the odor grew stronger as he came to the bedroom. The child was not breathing, did not have a pulse, and was "[v]ery cold" to the touch. Mr. Duck stated that the child's eyes were fixed and dilated and that he observed a "haze" over her eyes that typically did not occur until after the person is deceased. He said that although the bedroom was dimly lit, he could see that the child's skin was "sloughing" or separating and that one side of her head was swollen and discolored.

Mr. Duck testified that when the Defendant entered the bedroom, he informed her that the child was deceased, and the Defendant responded that the child had just been playing. Mr. Duck stated that it was obvious to him that the child not just not been playing. Based on the Defendant's statement, he began administering CPR and doing compressions.

He asked the Defendant when she last saw the child playing, and the Defendant responded, "Two hours ago." When Mr. Duck questioned the Defendant's statement, she responded, "Well, maybe it was earlier this afternoon." Mr. Duck testified that when he asked the Defendant about the cause of the child's sloughing skin, she responded, "I don't know. Quit asking me all these questions." She then left the room. Mr. Duck clarified that while these were not the Defendant's exact words when he questioned her about the child's sloughing skin, the Defendant "got frustrated at me and said something to that effect and exited the room." The Defendant did not tell him that any other children were inside the house other than the deceased child and the boy who met him at the front door.

Mr. Duck picked up the child, carried her to a cot, and then transported her to the ambulance. He stated that due to the better lighting in the ambulance, he was able to observe that the child had swelling to one side of her head directly above her ear, discoloration to her arms and legs, and sloughing skin. He had additional questions about the child's medical history, and while he was performing chest compressions, he asked someone from the fire department to bring a family member to the ambulance. The Defendant was brought to the ambulance, and Mr. Duck asked her about the child's allegories and medical history. The Defendant responded that she did not know, became frustrated, and walked away from Mr. Duck. Mr. Duck transported the child to the hospital.

Deputy Ryan Mays, a patrol officer with MCSD, was dispatched to the Defendant's home on October 30, 2018, at 5:29 p.m. following a call reporting an unresponsive three-year-old child. Paramedics were at the scene when Deputy May arrived. He entered the home through the living room, which he described as "extremely messy." He met the paramedic, who was carrying a child to an ambulance. Deputy May stated that the child was "very malnourished," that her eyes were "glossy," and that the child appeared to be deceased.

Deputy Mays testified that he saw the Defendant standing outside and that she appeared to be upset. He asked the Defendant about the child's medical history, but he could not understand what the Defendant was saying because she was "mumbling." He asked the Defendant about the last time that she had spoken with the child. Deputy Mays testified that he believed the Defendant replied that she had spoken to the child that morning. However, the Defendant was "mumbling," and he could not understand what she was saying.

MCSD Sergeant T.J. King, who was the lead investigator in the case, testified that he arrived at the home shortly after 6:00 p.m. As he was driving to the home, he passed the ambulance transporting S.Y. to the hospital, but he was unaware of her condition. When he arrived at the home, the children's mother, a seven-year-old girl, and a two-year-old boy were sitting in the backseat of one police car, while the Defendant was sitting in

the backseat of another police car. Sergeant King stated that the two children were "wild and rambunctious" and "appeared to be fine."

Sergeant King testified that he obtained consent to search the home from the children's mother and the Defendant, who were the only two adults living in the house. The Defendant complained of being dizzy and lightheaded, so Sergeant King requested medical personnel examine her. The Defendant stated that she wanted to go into the home with Sergeant King because another child was inside the home. Sergeant King stated that the consent to search form was signed at 6:57 p.m. and that up until that time, officers were unaware that another child was inside the home. Sergeant King and another deputy entered the home, called A.Y.'s name, and found her peeking out of the hallway bathroom. Sergeant King stated that he could tell that A.Y. was malnourished in that her ribs were visible, her skin around her cheeks was withdrawn, and her collarbone was protruding. The deputy who was with Sergeant King carried her to an ambulance, and she was transported to a hospital.

Sergeant King testified that he continued taking photographs and collecting evidence inside the home. He noted dirty pots and pans inside the kitchen showing that the adults in the home knew how to cook and had cooked food for themselves or for the children. The combination refrigerator/freezer inside the kitchen had chains and a padlock around it so that the children were unable to open it. Sergeant King observed food inside the refrigerator, the freezer, and the kitchen cabinets. The microwave was in working order. Sergeant King also observed chains, padlocks, and bungee cords over the bathroom faucets to prevent the children from turning on the water.

Sergeant King observed moth balls around the front steps and the porch. He collected a washrag inside the washer with "brown stuff" on it that he believed could have been part of S.Y.'s skin. He also collected a plastic bag with S.Y.'s name on it that contained a washrag and a bar of soap, a pair of girl's underwear and pajamas that he believed belonged to S.Y. in the trash, and a blue smock dress in the bathtub from the bathroom attached to the bedroom where S.Y. was found.

Sergeant King later obtained and executed a search warrant for the home, and he collected a checkbook with the Defendant's name and address on it, a packet of religious material listing the Defendant's name as the minister and the address of the home, documents containing the Defendant's medical information, an employment application printed out by the Defendant and dated February 8, 2018, and a medical bill in the name of the Defendant's daughter. Sergeant King also collected a red spiral notebook that contained handwritten grocery lists and reminder notes.

MCSD Investigator Andrew Smith went to JMCGH where he took photographs of the victims. He noted that the photographs showed that S.Y.'s body was in a state of decomposition in that portions of her skin were coming off various areas of her body, including her face. He also took a photograph of the bedding in the body bag in which she was lying showing skin that had fallen off S.Y.'s body. Investigator Smith took photographs of A.Y. as she was being treated by a nurse. He stated that the photographs showed "the advanced malnourishment of a child that's not eaten in a very long time" and that A.Y. looked like an "80-year old small woman" in that her skin was sagging from her body. He observed no muscle tone in A.Y.'s arms and legs. A.Y. was very hungry, and medical personnel were providing her with small amounts of food, which she was immediately eating.

Melinda Tubbs, a registered nurse at JMCGH, treated both victims. She testified that when the paramedics arrived with S.Y., they were breathing for her using a bag and a mask and were performing chest compressions. She stated that she was able to determine that S.Y.'s heart had stopped some time ago based on the state of S.Y.'s body. When the stretcher with S.Y.'s body was brought into a room, Ms. Tubbs could smell a strong odor indicating decomposition, and S.Y.'s skin was coming off her body. After one round of attempting to revive S.Y., the doctor declared her deceased.

Ms. Tubbs testified that when A.Y. arrived at the hospital, she was malnourished and dehydrated, only weighed approximately twenty pounds, and had a "cachectic appearance" in that she looked like a skeleton with skin. Medical personnel hooked A.Y. up to a heart monitor to check her heart and vital signs, and they administered fluids to her through an IV. Medical personnel decided to have A.Y. transferred to LeBonheur due to the concern of refeeding syndrome, a potentially fatal condition where a body that has been deprived of food for a long period of time struggles to consume food.

Dr. Jordan Ingram was working in the emergency room of JMCGH when the victims arrived. He testified that when S.Y. arrived at the hospital, he observed that her eyes were "clouded" and not "fully rounded" and that the whites of her eyes were swollen. He explained that fluid had been leaking from S.Y.'s eyes, which occurs when the eyes begin to lose interocular pressure. Dr. Ingram stated that S.Y.'s skin was sloughing and that there was a "rotting" odor in the room, demonstrating that her body was in a form of decomposition." Dr. Ingram said that based on the condition of S.Y.'s body, she would not have been playing during the morning or afternoon of the day on which she arrived at the hospital. He testified that the state of decomposition would have taken "well beyond" twenty-four hours of the time of death to occur and that S.Y. had been dead for "days." Dr. Ingram observed what appeared to be a puncture wound with some swelling in the area of S.Y.'s right temple.

Dr. Ingram testified that he also treated A.Y., who he stated was malnourished and was "literally skin and bones." He had never seen a child so thin. He had concerns about the possibility of refeeding syndrome, which could lead to A.Y.'s death, and stated that her liver enzymes were elevated and that her liver was in a "state of shock." He contacted medical personnel at LeBonheur, who agreed to accept A.Y. as a patient.

Dr. Karen Lakin, the medical director for the LeBonheur Cares Team and an expert in child abuse pediatrics, was the consulting physician for the primary team that treated A.Y. at LeBonheur. Dr. Lakin testified that A.Y. was in a state of malnutrition and starvation when she arrived at LeBonheur. Dr. Lakin noted that according to the records of a prior hospitalization in 2015, A.Y.'s height and weight fell within an appropriate range for her age at that time. When A.Y. arrived at the hospital in October 2018, she had only gained six hundred grams since 2015 and would have been expected to have gained four to six pounds a year during that time period. A.Y. weighed twenty-two pounds and two ounces and registered at less than the fifth percentile on the growth chart. She did not have any subcutaneous fat on her body; her cheeks were sunken; her skin was very loose; and the "bony protuberances in her body," such as her ribs, could be seen. Dr. Lakin stated that the starvation and malnourishment affected A.Y.'s height. A.Y. was ninety-four inches tall, which did not register on the growth chart for her age. Dr. Lakin said that the effect of the malnutrition on the A.Y.'s height demonstrated that the starvation and malnutrition had been occurring for a "prolonged period of time." According to X-rays, A.Y. had growth arrest lines in her bones, which showed that she had delayed growth due to starvation and that the growth accelerated during a period of intermittent nutrition.

Dr. Lakin testified that although A.Y. was able to breathe on her own and talk, she was considered a "very high risk patient" because she was "in a period of severe malnutrition and starvation." Dr. Lakin explained that patients who suffer from severe malnutrition can deteriorate quickly when food is reintroduced as the food can cause significant shifts in electrolytes and life-threatening complications. As a result, food had to be slowly introduced to A.Y. She had to undergo frequent blood draws to monitor her electrolytes, and fluids had to be provided intravenously. Dr. Lakin noted the difficulty of providing A.Y. with such low levels of food when her treatment began because A.Y. was constantly hungry and asking for food. Medical personnel increased the amount of food given to her as her electrolytes stabilized. A.Y. remained hospitalized for one week during which she gained three pounds. A.Y.'s family members were provided instructions regarding A.Y.'s diet, and she was prescribed supplements, such as nutrition shakes, because A.Y. was so malnourished. Dr. Lakin stated that during a follow-up appointment three weeks later, A.Y. had gained nine pounds since her release from the hospital and that her condition was "[e]xcellent."

Dr. Lakin testified that A.Y. was not provided with food to sustain her life, that she did not have a medical condition that prevented her from eating or processing food, and that "[s]he just had food withheld," which constitutes child abuse. Dr. Lakin stated that A.Y. appeared to have sustained some form of physical abuse and explained that A.Y. had pattern injuries on her skin where it appeared that she had been struck. Dr. Lakin also stated that A.Y. appeared to have been subject to targeting and possibly isolation, noting that investigators found her in a bathroom or "hidden away." Dr. Lakin said that A.Y.'s situation did not involve an instance of child abuse where an adult loses control and injures a child in a fit of anger or rage but that A.Y. was subjected to what is characteristically described as "child torture." Dr. Lakin explained that A.Y. was subjected to "systemic multiple events" rather than "isolated events" and that "[t]he idea that there is probably as opposed to a reaction, it is an action taken to control, which is very different." Dr. Lakin agreed that but for the medical intervention, A.Y. would have died from her injuries and that A.Y. is at high risk for psychological and physical issues due to the abuse, such as increased chronic illnesses and issues with her relationship with food. On cross-examination, Dr. Lakin stated that the long-term effects were beginning to materialize in that following A.Y.'s discharge from the hospital, family members reported that A.Y. would quickly eat a large amount of food to the point that she would vomit.

Rita McCoy, a medical legal death investigator with the medical examiner's office, went to JMCGH upon receiving a report of S.Y.'s death. Ms. McCoy testified that S.Y. was "very emaciated" and "extremely malnourished," and she was in a state of decomposition. S.Y.'s skin was slipping off her body, and the sclera of her eyes were dried and sunken back in her head. S.Y. had a puncture wound to her right temporal area and bruising that completely circled her eyes, which Ms. McCoy stated was often seen with a head injury. Ms. McCoy decided to send S.Y.'s body to Nashville for an autopsy.

Dr. Feng Li, the Chief Medical Examiner for Metropolitan Nashville and Davidson County and an expert in pathology and forensics, performed the autopsy of S.Y. He testified that S.Y.'s body was in the early stages of decomposition, that included skin slippage or sloughing and minimal rigor mortis. He stated that it was difficult to pinpoint exactly when S.Y. died because the state of decomposition is dependent upon several factors, including the temperature of the environment and the body and the layers of clothing. Dr. Li determined that S.Y. did not die on the same day in which she was found but had been deceased for "some time."

Dr. Li testified that S.Y.'s body was in a "very cachectic" state, which meant that she was "skin and bone, and very wasted and not well-nourished." She weighed nineteen pounds, was thirty-three and one-half inches tall, and fell within the fifth percentile on the growth chart for her age range. The toxicology report showed that S.Y. had hyponatremia,

which Dr. Li explained meant that her blood sodium level was so low that her body was unable to function, leading to her death.

Dr. Li testified that S.Y. sustained a blunt force injury to her head and that he observed extensive hemorrhaging in her optic nerves. He stated that an "[o]rdinary fall" would not have caused such an injury but that the injury was caused by her head striking a blunt object or by someone violently shaking her. The head trauma occurred very close to S.Y.'s death.

Dr. Li testified that the cause of S.Y.'s death was malnutrition and that the blunt force head injuries contributed to her death. He stated that S.Y. would have been deprived of food for "some time" in order to reach such a level of malnutrition. He concluded that the manner of death was homicide as a result of child abuse and neglect. He explained that due to S.Y.'s age, she was unable to care for herself and that the failure to provide her with nutrition constituted child abuse and neglect.

The fifty-seven-year-old Defendant elected to testify in her own defense. She denied intentionally refusing to provide food to the victims, preventing her daughter from giving the victims food, or striking or abusing the victims. The Defendant maintained that she gave food to the victims and that she instructed her daughter to give food to the victims. The Defendant stated she did not know why her daughter did not feed the victims. The Defendant stated that she was diabetic and kept her insulin and other medication in the refrigerator and that she instructed her daughter to place the chains over the refrigerator to prevent the children from obtaining her medication. The Defendant denied that the chains were to prevent the children from getting food from the refrigerator. She maintained that her daughter also placed the locks and bungee cords around the sinks.

The Defendant testified that she hears voices and has been doing so for more than thirty years. She stated that around the time that the victims became sick and S.Y. died, she was having difficulty attending her doctor appointments because she was working. As a result, she was unable to obtain her medications, was "blacking out more", and was "confused a lot and couldn't think clearly." She testified that she continued to hear voices at the time of trial and that although she was taking medication, her condition had not improved.

On cross-examination, the Defendant agreed that she told her daughter to feed the children because the Defendant was aware that the children could not survive without food. She acknowledged that she knew that withholding food from children was wrong, but she maintained that she was hearing voices "at the time." She denied seeing the victims starving and testified that she was hearing voices, was confused, and was blacking out, that she did not "know what to do about the situation," that they did not have any insurance,

- 11 -

and that she was "just doing what the voices told [her] to do." She stated that she did not know how the victims starved and that when she "could remember things, [she] fed them." She also stated that she did not call 911 when she saw that the victims were starving because she was not in her "right mind." She denied seeing S.Y. struck or kicked and stated that she was aware that striking a child was wrong "in today's world."

The Defendant agreed that she was able to know the difference between right and wrong and to conduct herself accordingly. She acknowledged that she was able to contact Rent-A-Center and negotiate favorable contract terms relating to payments. She stated that approximately one year before S.Y's death was when she was unable to attend her doctor's appointments and obtain her medication because she was working. She acknowledged that she had her own money and maintained a checking account.

In rebuttal, the State presented the testimony of Dr. Lucy Vinturella, a doctor of counseling psychology with Western Mental Health Institute ("Western") and an expert in the field of counseling psychology. Dr. Vinturella was a member of the team that conducted a thirty-day forensic evaluation of the Defendant in April 2019. The team assessed the Defendant for her competency to stand trial, her mental state at the time of the offenses, and alcohol and drug dependency. The team obtained the Defendant's records from Cary Counseling Center, Pathways, and Quinco Mental Health. The team concluded that the Defendant was competent to stand trial, that she did not require inpatient treatment for drug and alcohol dependency, and that at the time of the offenses, she was able to appreciate the nature and wrongfulness of her conduct.

Dr. Vinturella testified that in assessing the Defendant, they observed conduct indicating that she was malingering or exaggerating her symptoms. Dr. Vinturella noted that although verifying a person's claims to hearing voices can be difficult, there are "typical behavioral observations" that are consistent with someone who hears voices and that the Defendant did not demonstrate such behavior. The team members also administered testing to indicate malingering. Dr. Vinturella stated that based upon the results of the testing and the team members' observations of the Defendant's behavior, the team members "saw that there was what [they] felt was an exaggeration of symptoms."

On cross-examination, Dr. Vinturella agreed that the team members determined that the Defendant was competent to stand trial in that she understood the court proceedings and the possible consequences and that she was able to communicate with counsel. Dr. Vinturella stated that a person can have a mental illness but still be competent to stand trial. She stated that according to the Defendant's records from Quinco Mental Health, she was prescribed Haldol D and Decanoate, which is an injection. Dr. Vinturella did not know the symptoms that the Defendant was demonstrating that led to the prescription for Haldol D. She stated that Haldol D is a "major tranquilizer" that can be used to treat people who are

reportedly hearing voices, experiencing disorganized thinking, demonstrating other systems of schizophrenia. On redirect examination, Dr. Vinturella testified that she concluded that at the time of the commission of the offenses, the Defendant was able to appreciate the nature and wrongfulness of her conduct.

At the conclusion of the proof, the jury convicted the Defendant of first degree premeditated murder, felony murder, and two counts of aggravated child abuse. The trial court imposed sentences of life imprisonment for each of the murder convictions and merged the convictions. The trial court imposed twenty-five-year sentences for each of the aggravated child abuse convictions to be served concurrently to each other and to the sentence of life imprisonment. It is from these judgments that the Defendant now appeals.

## II. Analysis

### A. Sufficiency of the Evidence

The Defendant asserts that the evidence is insufficient to support the convictions. She does not challenge the sufficiency of the evidence as it relates to the specific elements of the offenses. Rather, she asserts that "there were two (2) adults in the home in the control of the minor children" and that the evidence failed to establish that the Defendant "was the person responsible for the actions or inactions causing the death of the minor child, [S.Y.], or the abuse of the child, [A.Y.]." The State responds that the Defendant failed to provide an adequate record on appeal and that the evidence is otherwise sufficient to support the convictions. We agree with the State.

When an accused challenges the sufficiency of the evidence, this court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon

direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This court must afford the State of Tennessee the " 'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

As related to the present case, first degree murder is the premeditated and intentional killing of another or the "killing of another in the perpetration of . . . aggravated child abuse[.]" T.C.A. § 39-13-202(a)(1), (2). A person commits aggravated child abuse when he or she commits child abuse and "[t]he act of abuse . . . results in serious bodily injury to the child[.] T.C.A. § 39-15-402(a)(1) (2016). A person commits child abuse when he or she "knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury[.]" T.C.A. § 39-15-401(a) (Supp. 2017). If the

- 14 -

abused child is eight years old or younger, aggravated child abuse is a Class A felony. T.C.A. § 39-15-402(b) (2016).

"The identity of the perpetrator is an essential element of any crime." *Rice*, 184 S.W.3d at 662 (citing *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975)). Whether the State has established the defendant as the perpetrator of the charged offenses beyond a reasonable doubt is "a question of fact for the jury upon its consideration of all competent proof." *State v. Bell*, 512 S.W.3d 167, 198 (Tenn. 2015) (citing *State v. Thomas*, 158 S.W.3d 361, 388 (Tenn. 2005)); *accord State v. Crawford*, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982) (citing *Stubbs v. State*, 393 S.W.2d 150, 153 (Tenn. 1965)).

The State asserts that "[t]hroughout her brief, the Defendant extensively cites to testimony that is not a part of the record." The State maintains that to the extent that the record is insufficient, this court must presume that the evidence was sufficient to support the convictions. The State does not specifically identify the testimony to which the Defendant cites in her brief that the State maintains is not part of the record. Furthermore, the testimony of each of the witnesses discussed by the Defendant in her brief was included in the appellate record. Thus, we decline to adopt the State's argument. However, we note that because the appellate record does not include the jury instructions or closing arguments, we cannot determine whether the trial court instructed the jury on criminal responsibility or whether the State argued criminal responsibility for the conduct of another as an alternative theory by which to seek a conviction. Nevertheless, we conclude that the evidence is sufficient to support the Defendant's convictions as a principal offender.

The evidence presented at trial established that the Defendant was one of two adults who lived in the home with the victims, both of whom were too young to care for themselves. As the victims' grandmother, the Defendant held a position of authority over the victims, and the evidence demonstrated that she also exercised control over the victims. Although the Defendant's daughter previously allowed M.S. to visit the victims and talk to them over the telephone, the Defendant denied M.S. access to the victims once the Defendant's daughter and the children began living with her. The Defendant threatened to call the police if M.S. did not stay away from them, and when M.S. asked to speak to the children during a telephone call with the Defendant's daughter, the Defendant interjected and refused M.S.'s request.

The Defendant acknowledged that she was responsible for the chain and padlock that locked the refrigerator and freezer doors. Although she denied that the purpose of the locks was to prevent the children from getting food and maintained that the purpose of the locks was to prevent the children from obtaining her insulin, the jurors, as evidence by their verdict, rejected this testimony, which was their prerogative as trier of fact. *See Bland*, 958 S.W.2d at 659. The Defendant also acknowledged that she was aware of the chains and

bungee cords over the bathroom faucets, and there was evidence presented at trial that these chains and cords would have prevented the children from getting water. The victims were visibly malnourished with sagging skin, protruding ribs and other bones, and no muscle tone. The evidence presented at trial established that the victim would have been deprived of food for a long period of time in order to reach this level of malnourishment. Sergeant King testified that he found food in the cabinets, the refrigerator, and the freezer. Thus, although food was in the home, it was withheld from the victims.

S.Y. was deceased for a period of time and in a state of decomposition before 911 was finally called. When emergency medical personnel arrived, the Defendant was untruthful in stating that S.Y. had just been playing earlier. The Defendant was then uncooperative with emergency medical personnel who were asking her questions about S.Y. in an effort to render aid to her. Police officers were at the scene for over one hour before the Defendant mentioned that another child, A.Y., was inside the home.

The jury, through their verdict, rejected the Defendant's testimony that she did not intentionally withhold food from the victims because at the time of the offenses, she was hearing voices, was "blacking out more," was confused, and was not able to "think clearly." Rather, Dr. Vinturella testified that the results of a forensic evaluation revealed that at the time of the offenses, the Defendant was able to appreciate the nature and wrongfulness of her conduct and that she was exaggerating her systems. The Defendant agreed at trial that she knew the difference between right and wrong and was able to conduct herself accordingly.

Taking the evidence in the light most favorable to the State, the proof presented at trial established that the Defendant, in conjunction with her daughter, deprived the victims of nourishment over the course of a long period of time, resulting in S.Y.'s death and causing A.Y. to suffer serious bodily injury. *See State v. Matthew Thomas Dotson*, No. E2019-01614-CCA-R3-CD, 2021 WL 3161218, at *31 (Tenn. Crim. App. July 27, 2021), *perm. app. denied* (Tenn. Dec. 9, 2021) (holding that the evidence was sufficient to support a conviction for aggravated child abuse when the proof established that the defendant, "in conjunction with [his wife], deprived the victim of nourishment over the course of many months causing the victim to suffer substantial impairment of a function of a bodily member, organ, or mental faculty"). Accordingly, the evidence is sufficient to establish the Defendant's identity as a perpetrator, and she is not entitled to relief regarding this issue.

### B. Denial of Expert Funding

The Defendant asserts that the trial court erred in denying her motion for funds to retain a mental health expert to conduct an independent forensic evaluation. She maintains

that the evaluation was necessary to support her insanity defense. The State responds that the Defendant failed to provide an adequate record for appellate review and that the trial court otherwise properly exercised its discretion in denying the Defendant's motion. We agree with the State.

In December 2018, before the Defendant was indicted, the general sessions court entered an order directing Pathways to evaluate the Defendant for competency to stand trial, her mental condition at the time of the offenses, and drug and/or alcohol dependency. According to the evidence presented at trial, in April 2019, the Defendant was evaluated at Western. The evaluation team sent a letter to the general sessions judge dated April 16, 2019, which was entered as an exhibit at trial, stating that the Defendant was competent to stand trial, that she was able to appreciate the nature and wrongfulness of her acts at the time of the offenses, and that she did not have an alcohol or drug dependency.

The Defendant was indicted in June 2019, and the trial court appointed the same attorney who represented the Defendant in the general sessions court. On October 28, 2019, counsel for the Defendant filed a notice of the intent to present an insanity defense at trial. On November 6th, the Defendant filed an "*Ex Parte* Motion for Psychiatric Expert Services" requesting funds to retain Dr. Keith Caruso, a psychiatrist in Brentwood, Tennessee. In the motion, the Defendant listed the charges and stated that she was indigent and, therefore, entitled to expert services to be paid by the State. Attached to the motion was an affidavit from Dr. Caruso setting forth his education, training, and experience. The affidavit stated that Dr. Caruso learned through counsel that the Defendant had "an extensive history of mental illness and psychiatric treatment," had previously been found incompetent to stand trial and not guilty by reason of insanity for offenses in the 1990's, and had a "long history of psychiatric hospitalization in the past." Dr. Caruso stated that as a result, the Defendant may have been either legally insane at the time of the offenses or unable to form the requisite mens rea for the offenses. On January 29, 2020, counsel filed a motion to withdraw, citing the trial court's refusal to grant funds to retain an expert to evaluate the Defendant. Counsel stated that during a January 13th status hearing, he requested that the trial court rule on the Defendant's motion for funding but that the trial court did not rule on the motion and set a trial date. Counsel attached to his motion an order entered in November 1997 by a trial court in Gibson County stating that the Defendant was adjudicated not guilty by reason of insanity on seven counts of attempted first degree murder.

On February 10, 2020, the Defendant through counsel filed a "Motion for Psychiatric Evaluation Performed by Dr. Keith Caruso," in which counsel stated that although the staff who evaluated the Defendant at Western determined that she was competent to stand trial and that insanity was not supported, the Defendant has a history of "adjudicated insanity findings against her." Counsel stated that he believed the

- 17 -

Defendant's mental health issues still existed, so as to necessitate a psychiatric evaluation. Attached to the motion were the prior pleadings and order related to the Defendant's case from 1997 and Dr. Caruso's curriculum vitae. Trial counsel was retained by the Defendant's friends to represent the Defendant at trial, and her prior counsel was allowed to withdraw.

On March 18, 2020, the Defendant, through trial counsel filed a "Motion for Forensic Evaluation," requesting that the trial court enter an order authorizing a forensic evaluation by Dr. Caruso. The one-page motion provided that "[t]he Defendant has previously been adjudged incompetent to stand Trial and is believed to be suffering from certain mental illnesses which are believed to be permanent and severe to such a degree as to have significantly impaired her mental ability to equate to a potential legally recognized defense." The Defendant also filed a notice of intent to rely upon an insanity defense. On April 6th, the trial court entered an order denying the Defendant's motion for a forensic examination. Although the order stated that a hearing on the motion was held on March 23rd, a transcript of the hearing is not included in the appellate record. In denying the motion, the trial court stated that the Defendant "has been evaluated at the State's request by Pathways Mental Health facility in Jackson, Madison County, Tennessee and has been deemed competent to stand Trial." The order was signed as approved for entry by both the prosecutor and the Defendant's trial counsel. On July 20, 2020, the Defendant, through trial counsel, filed a motion requesting a forensic evaluation by Pathways Mental Health to determine the Defendant's competency to stand trial. The motion stated that the Defendant "is evidencing considerable confusion and lack of understanding so as to be able to assist in the preparation of her defense and in the understanding of the legal process." On August 21, 2020, the trial court entered an order granting the motion, and according to statements made during the hearing on the motion for new trial, the Defendant was found to be competent to stand trial.

The Defendant raised the denial of funding to retain Dr. Caruso as an issue in her motion for new trial. During the hearing on the motion for new trial, the trial court noted that in denying the Defendant's funding request, the trial court had found that the information provided to the court "ex parte" did not establish that a reevaluation was necessary, that Dr. Caruso was not qualified to provide an opinion "that defense counsel was seeking to have in terms of…[the Defendant's] mental health," and that a reevaluation was not necessary to protect the Defendant's constitutional rights. The trial court restated these findings in its order denying the Defendant's motion for new trial.

"[W]hen a State brings its judicial power to bear against an indigent defendant in a criminal proceeding, it must take steps to insure that the accused has a fair opportunity to present his defense." *State v. Barnett*, 909 S.W.2d 423, 426 (Tenn. 1995) (citing *Ake v. Oklahoma*, 470 U.S. 68, 76 (1985)). The assistance provided to an indigent defendant need

not equal that "his wealthier counterpart might buy," but it must amount to the "'basic tools of an adequate defense or appeal.'" *Id.* (quoting *Ake*, 470 U.S. at 77). Pursuant to Tennessee Supreme Court Rule 13, section 5(a)(1),

> In the trial and direct appeal of all criminal cases in which the defendant is entitled to appointed counsel . . . , the court, in an *ex parte* hearing, may in its discretion determine that investigative or expert services or other similar services are necessary to ensure that the constitutional rights of the defendant are properly protected. If such determination is made, the court may grant prior authorization for these necessary services in a reasonable amount to be determined by the court. The authorization shall be evidenced by a signed order of the court. The order shall provide for the payment or reimbursement of reasonable and necessary expenses by the director.

The trial court's obligation to afford an indigent defendant with the benefit of expert assistance does not arise unless the defendant makes a threshold showing of a "particularized need" for the expert assistance. *See* Tenn. Sup. Ct. R. 13, § 5(c)(1); *Barnett*, 909 S.W.2d at 430-31. Particularized need is established:

> when a defendant shows by reference to the particular facts and circumstances that the requested services relate to a matter that, considering the inculpatory evidence, is likely to be a significant issue in the defense at trial and that the requested services are necessary to protect the defendant's right to a fair trial.

Tenn. Sup. Ct. R. 13, § 5(c)(2). Particularized need cannot be established and the trial court should deny requests for funding when the motion for funding includes only:

> (A) undeveloped or conclusory assertions that such services would be beneficial;
> (B) assertions establishing only the mere hope or suspicion that favorable evidence may be obtained;
> (C) information indicating that the requested services relate to factual issues or matters within the province or understanding of the jury; or
> (D) information indicating that the requested services fall within the capability and expertise of appointed counsel.

*Id*. at (c)(4). Unsupported assertions that an expert is necessary to counter proof offered by the State is not sufficient to establish particularized need. *Barnett*, 909 S.W.2d at 431. The defendant must reference facts and circumstances of the particular case and demonstrate that the appointment of the expert is necessary to ensure a fair trial. *Id*. The

- 19 -

issue of whether a defendant has made the threshold showing is to be determined on a case-by-case basis. *Id*. A trial court's denial of a request for expert funding is reviewed for an abuse of discretion. *State v. Scott*, 33 S.W.3d 746, 752 (Tenn. 2000).

The argument portion of the Defendant's brief on this issue consists of one paragraph, and she does not cite to any authority to support her claim that the trial court erred in denying her motion for expert funding. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). Furthermore, as noted by the State, the transcript of the hearings on the Defendant's motions for expert funding are not included in the appellate record. The appellate has the duty to "have prepared a transcript of such part of the evidence of proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b). In the absence of an adequate record, we presume that the trial court's judgments were correct. *State v. Richardson*, 875 S.W.2d 671, 674 (Tenn. Crim. App. 1993); *see Thompson v. State*, 958 S.W.2d 156, 171 (Tenn. Crim. App. 1997) (concluding that this court was unable to determine whether the trial court erred in denying the petitioner's request for funds for a psychologist or psychiatrist and an investigator when the transcript of the hearing on the motion was not included in the appellate record). "However, if the record provides an adequate basis for review, this court may reach the merits of an issue with the presumption that the missing part of the record would support the trial court's decision." *State v. Shaughn Walker*, No. W2019-00751-CCA-R3-CD, 2021 WL 4496508, at *10 (Tenn. Crim. App. Oct. 10, 2021), *perm. app. denied* (Tenn. Feb. 23, 2022) (concluding that although the transcript of the hearing on the *ex parte* motion for additional funding was not included in the appellate record, the record includes the trial court's articulation of its reasoning for denying additional funding and is, therefore, adequate for review, with the presumption that any missing portion would support the trial court's decision); *see State v. Jones*, 568 S.W.3d 101, 137 (Tenn. 2019) (noting that the defendant failed to include a transcript of the *ex parte* hearing on expert funding but holding that, on the basis of the record provided, the defendant had not established particularized need).

According to the trial court's April 6, 2020 order denying expert funding, a hearing was held on March 23, 2020, on the Defendant's motion.[3] However, a transcript of the hearing is not included in the appellate record. The trial court stated in its order that the Defendant had previously been evaluated by Pathways and had been found competent to stand trial. The report from Pathways is not included in the appellate record, and absent

---

[3] It is unclear whether this hearing was held *ex parte* as contemplated by Tennessee Supreme Court Rule 13, section 5 and *State v. Barnett*, 909 S.W.2d 423, 428-30 (Tenn. 1995). However, the Defendant did not raise this issue on appeal.

- 20 -

the transcript of the hearing, it is unclear whether the trial court was actually referring to the evaluation of the Defendant conducted by Western. In denying the Defendant's motion for new trial, the trial court clarified that the court relied upon two bases in denying the Defendant's motion for expert funding: (1) the information provided to the court did not establish that a reevaluation was necessary, thus finding that the Defendant failed to establish particularized need; and (2) Dr. Caruso was not qualified to provide an opinion sought by the Defendant. The record includes information submitted by the Defendant though her motions and attachments, including Dr. Caruso's affidavit and pleadings from prior proceedings, in seeking to establish particularized need. However, due to the absence of the transcript of the hearings on expert funding, the appellate record does not include the trial court's reasoning for finding that Dr. Caruso was not qualified. Furthermore, the Defendant does not challenge the trial court's findings regarding Dr. Caruso's qualifications in her brief. *See State v. Deandrey Peterson*, No. W2016-01878-CCA-R3-CD, 2018 WL 1363367, at *12 (Tenn. Crim. App. Mar. 15, 2018) (holding that the defendant failed to establish that the trial court erred in admitting evidence of other criminal offenses pursuant to Tennessee Rule of Evidence 404(b) when the defendant, on appeal, did not challenge the basis or purpose upon which the trial court admitted the evidence). Due to the inadequacies of the appellate record and in the Defendant's brief, we conclude that the Defendant has failed to establish that the trial court abused its discretion in denying the Defendant's motion for expert funding.

## C. Sentencing

The Defendant contends that the trial court erred in ordering consecutive sentences. However, the record reflects that the trial court declined to impose consecutive sentences and ordered that the sentences for each conviction be served concurrently for an effective sentence of life imprisonment.

## III. Conclusion

Based upon the foregoing, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE